13-3592-cv
Victory v. Pataki et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

## SUMMARY  ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND  THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York on the 17ᵗʰ day of April, two thousand fifteen.

Present:      ROSEMARY S. POOLER,
              BARRINGTON D. PARKER,
                    *Circuit Judges*.[*]

_____

ALBERT LOPEZ VICTORY,

                    *Plaintiff-Appellant*,

              v.                                          13-3592-cv

GEORGE PATAKI, Former Governor of the State of New York in his official capacity, BRION D. TRAVIS, Ex-Chair, Board of Parole, New York State Division of Parole, THOMAS P. GRANT, Special Assistant to the Chair of the Board of Parole, MIKE HAYDEN, Acting Director of the Division of Parole, RONALD P. WHITE, Director of Upstate Field Operations for the Division of Parole, TERRANCE X. TRACY, Chief Counsel to the Chair of the Board of Parole,  KENNETH E. GRABER, Commissioner of the Board of Parole, GEORGE CHARD, Senior Parole Officer, Utica Parole Office, DOUGLAS C. SMITH, Ex-Supervising Parole Officer, Utica Parole Office, PERRITANO, "JOHN," First Name Unknown, Parole Officer, Utica Parole Office, KEVIN MCCARTHY, Head of the Special Services Bureau for the Division of Parole, Central New York Area, THOMAS MURFITT, Syracuse Police Officer, GILHOOLEY, "JOHN," first name unknown, Syracuse Police Officer, TIMOTHY FOODY, Ex-Police Chief, Syracuse Police Department, John Does, 1, 2, 3, etc., Jane Does 1, 2, 3, etc., (whose identities are unknown but who are believed to be either employees of the Division of

_____

[*]  The Honorable Richard C. Wesley of the United States Court of Appeals for the Second Circuit was originally assigned as a member of the panel, but recused himself prior to oral argument and did not participate in the appeal. The appeal is being determined by the remaining members of the panel, who are in agreement.  *See* 2d Cir. R. § 0.14(b); *Murray v. National Broad. Co.*, 35 F.3d 45, 46 (2d Cir. 1994).

Parole, the Governor's Office, and/or the Syracuse Police Department); all such individual defendants being sued both in their individual and official capacity, THE CITY OF SYRACUSE, New York, DENNIS DUVAL, Chief of Police of the Syracuse Police Department, GEORGE ALEXANDER, Chair, Board of Parole, in his official capacity, GOVERNOR DAVID PATERSON, RORY D. GILHOOLEY, Syracuse Police Officer, JOHN FALGE, Ex-Police Chief, Syracuse Police Department, GARY MIGUEL, Police Chief, Syracuse Police Department, ELIOT SPITZER, Governor of the State of New York in his official capacity,

*Defendants-Appellees.*[**]

| | |
|---|---|
| Appearing for Appellant: | Myron Beldock, Beldock Levine & Hoffman LLP, New York, N.Y. *for* Albert Lopez Victory. |
| Appearing for Appellees: | Andrew B. Ayers, Assistant Solicitor General, Office of the Attorney General (Eric T. Schneiderman, Attorney General of the State of New York; Barbarda D. Underwood, Solicitor General; Nancy A. Speigel, Senior Assistant Solicitor General, *on the brief*), Albany, N.Y. *for* New York State Appellees. |
| | Shannon T. O'Connor, Assistant Corporation Counsel for the City of Syracuse, (Robert P. Stamey, Corporation Counsel for the City of Syracuse, *on the brief*), Syracuse, N.Y. *for* City of Syracuse Appellees. |

Appeal from the United States District Court for the Western District of New York (Skretny, *C.J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be and it hereby is **REVERSED** in part, **AFFIRMED** in part, and **REMANDED** for a trial on the due process claims.

Plaintiff-Appellant Albert Lopez Victory, a former inmate of the New York Department of Corrections and Community Supervision ("DOCCS"), appeals from the August 27, 2013 order of the United States District Court for the Western District of New York (Skretny, *C.J.*) granting summary judgment for defendants and dismissing in its entirety his complaint. *See Victory v. Pataki*, No. 02-CV-0031, 2013 WL 4539296 (W.D.N.Y. Aug. 27, 2013). On appeal, Victory challenges the dismissal of those claims brought pursuant to 42 U.S.C. § 1983 against various New York State officials and employees ("State Defendants") as well as the City of Syracuse and several of its police officers (collectively "Syracuse Defendants") for violating and conspiring to violate Victory's due process, equal protection, and Fourth Amendment rights in connection with the rescission and revocation of his parole. Because we conclude that genuine

---

[**] The Clerk of the Court is directed to amend the caption as above.

2

issues of material fact preclude summary judgment for certain State Defendants on Victory's due process claims arising out of the rescission of his grant of parole release, we reverse in part and remand to permit Victory to proceed at trial on this claim.

We review the district court's grant of summary judgment de novo. *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). In assessing the record to determine whether there is a genuine dispute as to any material fact, we resolve all ambiguities and draw all permissible inferences in favor of the non-moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). We assume the parties' familiarity with the underlying facts and procedural history, which we recount only to the extent necessary to explain our decision.

## I.    Background

In 1970, Victory entered DOCCS custody to serve a sentence of twenty-five years to life upon his conviction of felony murder, stemming from his involvement in the shooting death of a police officer. *See People v. Bornholdt*, 350 N.Y.S.2d 369 (1973) (upholding conviction); *Victory v. Bombard*, 570 F.2d 66, 70 (2d Cir. 1978) (reversing grant of writ of habeas corpus). In 1978, Victory absconded from Green Haven Correctional Facility and remained at large for three years before being apprehended. The defendants do not dispute that Victory behaved as a model prisoner throughout the 21 years following his return to DOCCS custody in 1981.

It is undisputed that throughout the period Victory was eligible for parole release, former Governor George Pataki espoused strong beliefs that parole should not be granted to violent felons and publicly supported legislative reforms that would abolish parole for this category of offender. In 1997, Victory's initial parole application was denied, but a two-member panel was unable to reach a consensus with respect to his next two applications.

On January 11, 1999, Victory was considered for parole release for the fourth time by a two-member panel consisting of Commissioners Kenneth Graber and Lawrence Scott. During the hearing, Commissioner Graber assured Victory that the panel had reviewed all the documents in his file, even if it failed to mention every consideration. The information before the panel contained numerous prominent references to Victory's 1978 escape. However, unlike the two prior panels, the January 11, 1999 panel never explicitly mentioned Victory's escape.[1] Graber and Scott granted Victory's application for parole and assigned him an open release date of March 11, 1999. Pursuant to the direction of non-party Katherine Lapp, who then served as Pataki's Director of Criminal Justice, Victory was not informed of the panel's determination until January 19, 1999, when he simultaneously received a Notice of Temporary Suspension of Parole Release.

---

[1] The January 11, 1999 parole panel did discuss, without further inquiry, certain facts related to his escape, such as his disciplinary record and the fact that Victory married his current wife "twenty-one years ago, [in] 1978" and had "one daughter who is now eighteen." App'x at 941, 943.

3

The core dispute concerns the events precipitating the March hearing to rescind Victory's grant of parole release. Victory proffered admissible evidence supporting the following allegations. On January 12, 1999—the day after the panel granted Victory parole—Thomas P. Grant, the Special Assistant to the Chairman of the Board of Parole, received a media inquiry requesting the outcome of Victory's hearing. Grant then called Terrance X. Tracy, Chief Counsel to the Chairman of the Board of Parole, to inform him that Victory had been granted release. Grant also called Director Lapp at the Governor's office and conveyed the panel's determination along with the nature of Victory's offense and his history as an escapee. Five minutes later, Lapp called Grant back to request that he immediately send the file that had been before the January 11, 1999 panel to her in Albany. On January 13, 1999, it is undisputed that Lapp met with Tracy and Grant to discuss whether proper procedures were followed during the hearing, and they addressed the issue of Victory's escape. Grant testified that Lapp instructed him not to serve Victory with the panel's decision until she had an opportunity to review the file, and this instruction was implemented by Michael Hayden, the Deputy Chief of Operations of the Department of Parole. That same day, Lapp also contacted Assistant District Attorney James Kindler and Judge John F. Keenan, the former Assistant District Attorney who had prosecuted Victory, requesting information to supplement the record militating against his release. Kindler testified that he understood the panel "would need new information." On January 14, Kindler sent a letter in opposition to Victory's release, which emphasized the escape. On March 8, 1999, Judge Keenan wrote a letter to Pataki that was provided to the Parole Board, discussing at length Victory's escape and urging the Governor to prevent his release.

On March 9, 1999, a rescission hearing was held before a three-member panel, which included Commissioner Graber. The only evidence offered on the issue of whether Victory's escape was unknown to the January 11, 1999 panel was Graber's own unsworn statements to this effect. Based on "new materials" highlighting Victory's escape, the rescission panel unanimously voted to rescind Victory's release. On November 8, 1999, the Board of Parole Appeals Unit reversed the rescission determination, concluding that "[t]he conduct of Commissioner Graber acting as unsworn witness, prosecutor and judge at the rescission hearing so tainted the proceeding that the rescission hearing must be deemed constitutionally insufficient in violation of Mr. Victory's right to due process." App'x at 1215. It therefore remanded for a new rescission hearing to be convened immediately before a panel of three commissioners who lacked any prior involvement in Victory's case.

Ultimately, the rehearing never transpired. On December 15, 1999, the Wyoming County Supreme Court (Dadd, *J.*) ("Dadd Order") granted Victory's state habeas petition and ordered his immediate parole release. Victory was released on December 28, 1999. The Fourth Department subsequently reversed the Dadd Order as premature and reinstituted the Board of Parole's direction to conduct a new rescission hearing. *People ex rel. Victory v. Herbert*, 716 N.Y.S.2d 254 (4th Dep't 2000), *lv. denied*, 723 N.Y.S.2d 132 (2001). A second hearing was rendered unnecessary, however, by Victory's reincarceration for violating the conditions of his parole during his intervening release. *See People ex rel. Victory v. Travis*, 734 N.Y.S.2d 749, 751 (4th Dep't 2001).

On April 7, 2000, Syracuse police officers arrested Victory for his admitted consumption of alcohol and his violation of a parole condition imposed by Syracuse Parole Officer Kevin McCarthy, that he not enter any establishment serving alcohol. Later that year, a final hearing

revoked Victory's parole and recommended a 28-month delinquent time assessment. The Board of Parole affirmed the parole commissioner's decision to instead impose a time assessment of 60 months. Victory challenged his parole revocation, alleging that his restrictive conditions of release, intensive surveillance, and excessive time assessment constituted selective enforcement. The Clinton County Supreme Court (Feldstein, *J.*) upheld the revocation decision, but determined that the 60-month delinquent time assessment was excessive. Because Victory had already served the majority of this term, the court ordered that Victory be immediately considered for re-release to parole supervision. On October 18, 2005, Victory was re-released.

## II.      Parole Rescission Claims

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000). Although a state prisoner has no liberty interest in "the mere possibility of release," *Barna v. Travis*, 239 F.3d 169, 170–71 (2d Cir. 2001), parole grantees have a protectable liberty interest entitling them to due process during a hearing to rescind a prior grant of parole, *see Green v. McCall*, 822 F.2d 284, 289–90 (2d Cir. 1987); *Drayton v. McCall*, 584 F.2d 1208, 1214 (2d Cir. 1978). Due process protections extend to the present context, in which "parole release may be temporarily suspended or rescinded based upon significant information which existed where such information was not known by respondent." *Raheem v. N.Y.S. Bd. of Parole*, 888 N.Y.S.2d 631, 633 (3d Dep't 2009) (internal alterations and quotation marks omitted); *see also* 9 N.Y.C.R.R. § 8002.5(b)(2)(i); *Ortiz v. N.Y.S. Bd. of Parole*, 668 N.Y.S.2d 823, 825 (4th Dep't 1998). The minimal guarantees of procedural due process require that the decision be issued by "a neutral and detached hearing body such as a traditional parole board" and supported by at least "some evidence," *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (internal quotation marks omitted).

Victory alleges that the State Defendants violated and conspired to violate his right to due process by fabricating a false basis for rescinding his parole and by depriving him of an unbiased panel at his rescission hearing. The district court acknowledged that the rescission hearing was "problematic on a due process level" and that "there arguably exist issues of fact with regard to whether Graber knew of the escape, and therefore whether the information that his rescission hearing was based upon was 'new' for purposes of 9 N.Y.C.R.R. § 8002.5(b)(2) (i)." *Victory*, 2013 WL 4539296, at *17. Nonetheless, it held that Victory could not sustain a claim based upon his parole rescission because Graber was protected by absolute immunity and Victory could not establish the personal involvement of any of the other named defendants since these individuals did not "directly participate" in the rescission hearing. *Id.*

We affirm the district court insofar as it concluded that Graber was entitled to absolute immunity for any actions taken while performing the quasi-judicial function of deciding whether to grant, deny, or rescind Victory's parole. *See Montero v. Travis*, 171 F.3d 757, 759 (2d Cir. 1999) ("[W]e hold that Graber was entitled to absolute immunity because he was acting in a quasi-judicial capacity when he revoked Montero's parole."). However, Graber's absolute immunity does not protect other alleged wrongdoers who violated Victory's due process rights while not performing a judicial function. *See Zahrey*, 221 F.3d at 353; *Scotto v. Almenas*, 143 F.3d 105, 110–13 (2d Cir. 1998) (no absolute immunity for parole officers who fabricated parole violation while acting in investigatory capacity); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123,

130 (2d Cir. 1997) (no absolute immunity for police officer who conspired to fabricate and forward to prosecutors a known false confession); *see also Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (police officer who perjured himself before grand jury not entitled to absolute immunity for lying to the district attorney and knowingly falsifying and omitting material facts from police reports).

We agree with Victory that the district court erred in concluding that no rational jury could find that any of the other defendants conspired to violate his right to due process. Despite the State Defendants' admission to multiple conversations regarding Victory's parole, the district court found that Victory could not establish the agreement necessary to sustain a conspiracy claim due to lack of direct evidence "that these individuals agreed to anything other than reviewing Plaintiff's parole file." *Victory*, 2013 WL 4539296, at *20. It is axiomatic, however, that "conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence." *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994); *see also United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) ("[I]t is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." (internal quotation marks omitted)). Therefore, in assessing the evidence supporting Victory's allegations, the district court was not permitted to rely on the fact that no State witness admitted to any impropriety.

The district court did not draw all reasonable inferences in Victory's favor when it concluded that "Graber's failure to note the escape in the parole file when it was readily available was nothing more than a mistake" and that no nexus existed "between Lapp, Kindler, Keenan, Grant, Travis, and Tracy discussing Plaintiff's parole file and Graber depriving Plaintiff of an impartial hearing." *Victory*, 2013 WL 4539296, at *20. Crucially, at no point did the district court address the phone records corroborating Victory's contention that the conversations allegedly identifying Victory's escape as a basis for rescission preceded Graber's own purported realization that he had overlooked the escape. Whereas the State Defendants asserted that Graber first became aware of Victory's escape on January 13, 1999, during a phone conversation between Graber, Tracy, and Grant, Victory pointed to phone records indicating that this call could not have occurred until January 14, 1999, the day after admissible evidence suggests that Lapp was already soliciting letters emphasizing the escape. As the district court at one point acknowledged, Victory raised a genuine dispute as to whether Graber lied about his awareness of the escape to the rescission panel. Considering these facts in conjunction with the State Defendants' inconsistent testimony regarding the chain of events preceding the rescission hearing, a reasonable juror could conclude that there was an agreement among those defendants who prematurely set in motion rescission procedures with this allegedly false pretext in mind. *See Ricciuti*, 124 F.3d at 129. These "inference[s] of impropriety" distinguish Victory's conspiracy allegations from those that we have dismissed on the basis that they are supported only by "unsubstantiated speculation" with no evidence "to suggest anything untoward took place." *Scotto*, 143 F.3d at 115. Accordingly, we reverse the dismissal of Victory's due process claims against Tracy, Grant, and Travis.

We also reverse the grant of summary judgment for lack of personal involvement with respect to Michael Hayden and Ronald White, both directors of the Division of Parole. "[P]ersonal involvement is a question of fact," *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006), which may preclude summary judgment, *see, e.g.*, *Ricciuti*, 124 F.3d at 129. Here, it is undisputed that Hayden and White arranged for Victory's file to be sent to Lapp in Albany, and

6

that, prior to deciding to convene a rescission hearing, they had conversations with Grant and Tracy about the panel's failure to mention Victory's escape. Despite the district court's assertion to the contrary, *Victory*, 2013 WL 4539296, at \*5, Hayden also testified that he participated in the decision to initiate a rescission hearing. White was subsequently involved in arranging the procedural aspects of the rescission hearing. It is undisputed that White received the names of the three commissioners assigned to the panel in advance of the rescission hearing, although it is unclear precisely how Graber came to be assigned to this panel. Given this backdrop, the district court decided disputed issues of material fact when it concluded that none of the State Defendants either assigned Graber to the rescission panel or knew that Graber would be assigned to the rescission panel. *Victory*, 2013 WL 4539296, at \*20. Rather, a triable issue remains as to whether White and Hayden personally participated in orchestrating a rescission hearing where they knew Graber would provide a false pretext for rescission, while simultaneously serving as judge and unsworn witness.[2]

The district court also dismissed former Governor Pataki for lack of personal involvement. While the opinion below failed to draw all inferences in Victory's favor in this respect, we nonetheless agree with its ultimate determination that Victory failed to come forth with evidence that would permit a jury to reasonably find that Pataki was personally involved in depriving Victory of due process. As an initial matter, the undisputed involvement of two high-ranking members of Pataki's staff in the events preceding the rescission hearing is insufficient to establish Pataki's liability "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). Moreover, while Victory suggests that these staff members were acting pursuant to Pataki's instruction or request, he relies on mere speculation in asserting that Pataki was even aware of Victory's case at that time. Even if a jury were to discredit the testimony of Pataki's staff and conclude that Pataki became aware of Victory's grant of parole on January 12, 1999, the jury would still be left to rely only "on mere speculation or conjecture as to the true nature" of Pataki's involvement in his staff's subsequent alleged misconduct, for which it is undisputed Pataki was not present. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

Victory has similarly failed to show that Pataki fostered a policy or custom that deprived him of due process during his rescission hearing. Undeniably, there is evidence in the record to suggest that Pataki promoted a blanket policy opposing parole for violent offenders, but this does not support the inference that he "created a policy or custom under which unconstitutional practices occurred." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010). Victory does not allege that Pataki generally encouraged his staff to intervene in parole decisions or ratified the rescission procedures employed by the Board of Parole. In fact, Victory repeatedly argued that his treatment was anomalous and that Lapp's involvement in the process was unprecedented. Accordingly, we affirm the district court's dismissal of Pataki for lack of personal involvement.

---

[2] We do not opine on whether absolute immunity would bar claims against the individual who assigned Graber to the panel, as the State Defendants have not asserted that defense on behalf of White or Hayden. *See Rodriguez v. Weprin*, 116 F.3d 62, 66–67 (2d Cir. 1997).

### III.    Parole Supervision and Revocation Claims

We affirm the grant of summary judgment in all other respects. The district court properly dismissed Victory's equal protection claims in light of his failure to come forth with any evidence suggesting that his admittedly stringent treatment during his parole supervision or revocation was motivated by impermissible considerations. This Court has previously explained that an unofficial policy to deny parole to all violent offenders would not violate the Equal Protection Clause of the Fourteenth Amendment because such disparate treatment is rationally related to the legitimate state interest in protecting the public. *See Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012). Victory asserts that he was treated more severely than other violent offenders, but concedes that this difference stemmed from his status as a "cop killer." That parole restrictions may vary according to the nature of an offender's crime requires no citation. Likewise, Victory's challenge to his parole supervision fails under a "class-of-one" theory because Victory has presented no evidence that he was subject to a higher level of supervision than other similarly situated parolees. *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010) ("Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." (alterations and internal quotation marks omitted)).

The district court dismissed Victory's Fourth Amendment challenge on the basis that he failed to proffer any admissible evidence that the defendants actually placed a global positioning system device ("GPS") on his vehicle. Upon de novo review, we find no error in the district court's holding in this respect. Even assuming that Victory had raised a genuine dispute as to the GPS's placement, the defendants personally involved would be entitled to qualified immunity because, in 2000, when the alleged conduct occurred, it was not "clearly established" that the warrantless placement of a GPS device on the vehicle of a parolee subject to electronic monitoring would violate the Fourth Amendment. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also United States v. Aguiar*, 737 F.3d 251, 261–62 (2d Cir. 2013) (holding police officers' warrantless placement of GPS on defendant's vehicle fell within the good-faith exception to exclusionary rule because such conduct was "objectively reasonable" under *United States v. Knotts*, 460 U.S. 276, 281 (1983)).

Victory asserts no other colorable challenge to his supervision during his parole release. Although he repeatedly asserts that the Department of Parole violated New York regulations or its own policies, such conduct is not actionable under Section 1983. *See Wray v. City of New York*, 490 F.3d 189, 193–95 (2d Cir. 2007). Similarly, while Victory alleges a conspiracy between McCarthy and the Syracuse Defendants, he does not identify a federal or constitutional right that these individuals conspired to violate. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). Furthermore, the intracorporate conspiracy doctrine bars Victory's conspiracy claims arising out of the zealous supervision performed by his parole officers. *See Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978). Finally, the district court properly dismissed Victory's challenges to the proceedings resulting in his parole revocation as barred by *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).

In sum, we reverse the grant of summary judgment with respect to Board of Parole officials Tracy, Grant, and Travis, and Division of Parole officials Hayden and White, because

triable issues remain as to whether these individuals were personally involved in depriving Victory of due process. We affirm the district court's dismissal of all of Victory's remaining claims.

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk